J-S31008-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JOSHUA JORDAN | |
| Appellant | No. 429 EDA 2021 |

Appeal from the PCRA Order Entered January 15, 2021
In the Court of Common Pleas of Philadelphia County
Criminal Division at No: CP-51-CR-12114-2013

BEFORE:  STABILE, J., KING, J. and PELLEGRINI, J.[*]

MEMORANDUM BY STABILE, J.:              **FILED FEBRUARY 14, 2022**

Appellant, Joshua Jordan, who is serving a mandatory life sentence for first-degree murder and a consecutive term of imprisonment for other convictions, appeals from an order denying his petition under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546.  We affirm.

The PCRA court accurately summarized the evidence adduced during trial as follows:

> At trial, the Commonwealth presented the testimony of Philadelphia Police Detectives Omar Jenkins and John Komorowski, Philadelphia Police Officers Michael Kilroy, Christian Cruz, Craig Perry, Jesus Cruz, Robert Bakos, and Brian Waltman, Philadelphia Deputy Medical Examiner Dr. Albert Chu, Unique Riggins, Kenneth White, Shawn Adams, and Isaac Guy. [Appellant] testified on his own behalf and presented the testimony of Andrea Jordan and Elbert Jordan.  Viewed in the light most favorable to the Commonwealth as the verdict winner, the evidence established the following.

_____

[*] Retired Senior Judge assigned to the Superior Court.

On July 14, 2014, at approximately 9:58 p.m., Craig Jackson, the decedent, was playing a game of basketball at the courts at B and Olney Streets in Philadelphia. Jackson's team was playing against [Appellant]'s team. As the game progressed, Jackson and [Appellant] fouled each other, inciting an argument that escalated, with a physical fight seemingly imminent. [Appellant] left the court, went to his book bag, and withdrew a semi-automatic firearm, pointing it at Jackson. Jackson told [Appellant] "If you're going to shoot, go ahead and shoot." [Appellant] responded by shooting at Jackson multiple times, striking Jackson once in the left chest, and once in the left buttock.

[Appellant] then fled the scene, placing the gun back into the book bag. Jackson was transported to Einstein Hospital by emergency medical personnel, where he was pronounced dead on July 14, 2013. Witnesses Unique Riggins and Isaac Guy saw [Appellant] later that night. [Appellant] had changed his clothes and told Riggins and Guy, "I'm not playing with this nigger. If he lives, I'm going to shoot him again."

In police interviews shortly after the shooting, witnesses Riggins and Shawn Adams both identified [Appellant] as the shooter from a photo array. Police attempted to arrest [Appellant] at home on July 20, 2013, but he was not present at the time. Police encountered [Appellant] on the street on July 21, 2013 and asked him to identify himself. [Appellant] gave a false name, and multiple birthdates. After being shown a photograph the police had retrieved of the person whose name [Appellant] was using, [Appellant] gave his real name and birthdate. Upon his arrest, [Appellant] stated that "he wasn't on the basketball courts that night."

While in prison awaiting trial, [Appellant] made a series of phone calls. In one conversation, [Appellant] told his mother that he "really should've ran." In several other conversations, he repeatedly asked whether there were video cameras covering the playground, making sure that his brother Isaiah had "checked every aspect of that park." In another conversation, [Appellant] and Isaiah urgently discussed the problem that someone named "Pete" had the gun and wanted to "swap it out" instead of destroying it. Isaiah assured [Appellant] that he would "break that jawn down ... and throw it, throw it, throw it," to which [Appellant] replied, "You got it?" In another conversation, after

- 2 -

hearing that the defense investigator confirmed that there were no cameras covering the crime scene, [Appellant] told Isaiah, "I was at the crib through wink wink. Know what I'm saying I was at the crib." Isaiah and [Appellant] also discussed the problem of "the motherfuckers that saying [Appellant] did it." Isaiah assured [Appellant] that they would find out who those people were before court.

PCRA Court Opinion, 4/22/21, at 5-6 (citations omitted).

On July 15, 2016, a jury found Appellant guilty of one count each of first degree murder (18 Pa.C,S.A. § 2502), possession of a firearm without a license (18 Pa.C.S.A. § 6106), possession of a firearm on the streets of Philadelphia (18 Pa.C.S.A. § 6108), and possession of an instrument of crime (18 Pa.C.S.A. § 907). The court imposed the mandatory sentence of life in prison for the murder charge (18 Pa.C.S.A. § 1102(a)(1)) and sentenced Appellant to a consecutive aggregate term of 6½ to 13 years' imprisonment on the remaining charges. The court added an additional 3 to 6 months' consecutive imprisonment for contempt of court after defendant yelled an expletive to the decedent's family after sentencing.

Appellant filed a direct appeal, and on December 29, 2017, this Court affirmed his judgment of sentence, holding, *inter alia*, that Appellant waived his challenge to the sufficiency of the evidence due to the vagueness of his Pa.R.A.P. 1925 concise statement of matters raised on direct appeal. **Commonwealth v. Jordan**, 2017 WL 6629526, *2 (Pa. Super., Dec. 29, 2017).

On July 31, 2018, the Pennsylvania Supreme Court denied Appellant's petition for allowance of appeal. On November 26, 2018, Appellant filed a timely *pro se* PCRA petition. The PCRA court appointed James Berardinelli, Esquire to represent Appellant. On January 4, 2020, Mr. Berardinelli was relieved, and on January 31, 2020, Gina Amoriello, Esquire was appointed to represent Appellant. On March 20, 2020, pursuant to **Commonwealth v. Finley**, 550 A.2d 213 (Pa. Super. 1988), Ms. Amoriello filed a letter seeking leave to withdraw as counsel because there was no merit to Appellant's PCRA claims and no other issues in the record had merit. Due to administrative issues caused by the coronavirus pandemic, the PCRA court did not receive the no-merit letter until June 8, 2020. On July 8, 2020, the PCRA court issued a notice pursuant to Pa.R.Crim.P. 907 of its intent to dismiss Appellant's PCRA petition without an evidentiary hearing. On July 10, 2020, the PCRA court received Appellant's *pro se* response to the no-merit letter. Appended to this response was Appellant's *pro se* motion to amend his PCRA petition. On August 3, 2020, Appellant filed a response to the Rule 907 notice. On October 21, 2020, Ms. Amoriello filed a reply to Appellant's Rule 907 response. On November 13, 2021, the PCRA court denied Ms. Amoriello's motion for leave to withdraw and ordered her to respond to Appellant's motion to amend his PCRA petition. On January 3, 2021, Ms. Amoriello filed a supplemental **Finley** letter stating that she found no issues of arguable merit in the motion to amend. On January 15, 2021, the PCRA court dismissed Appellant's PCRA

petition, granted Ms. Amoriello leave to withdraw her appearance, and instructed Appellant that he could either proceed *pro se* or through privately retained counsel.[1]  Acting *pro se*, Appellant filed a timely appeal.

Appellant has filed a *pro se* brief in this Court in which he raises a number of issues, which we re-order for the sake of convenience:

> 1. Did not the PCRA court err when it appointed Gina Amariello to represent Appellant during his PCRA proceeding after she had already filed a no-merit letter and made it abundantly clear she had no interest in representing Appellant and complained to PCRA courts that she could not represent Appellant effectively thus creating a conflict of interest and denying Appellant effective assistance of PCRA counsel?
>
> 2. Appellant's 6th and 14th Amendment rights under the United States Constitution and his State Constitutional right under Article 1 sections 9, 13 of the Pennsylvania Constitution were violated when the prosecution failed to turn over to the defense regarding homicide Detective Omar Jenkins' internal affairs investigative records and misconduct records concerning history of fabricating witnesses' statements.
>
> > (i).  To the extent that this court finds that the prosecution was not obligated to disclose the evidence to Appellant's counsel, then Appellant was denied effective assistance of counsel when his trial attorney failed to uncover and introduce Detective Jenkins' misconduct record.
>
> 3. Did not the prosecution violate the 14th amendment under **Brady v. Maryland**, 373 U.S. 63 (1963) by illegally suppressing Internal Affairs investigative reports and/or complaints regarding Detective Omar Jenkins' coercive and illegal tactics in a separate homicide case against then defendant Roca Ford, establishing a *prime facie* case for an evidentiary hearing to determine or record whether the investigative tactics employed by Jenkins establish a

---

[1] We have reviewed Ms. Amariello's letters to the PCRA court and conclude that they satisfactorily explain why each of the issues raised in Appellant's original PCRA petition and supplemental filings are devoid of merit.

pattern, custom and practice of coercing witnesses into identifying innocent persons of crimes they did not commit and whether such suppressed evidence would have been relevant to the jury in present case? Was not PCRA counsel ineffective for failing to raise this claim?

4. Were not Appellant's constitutional rights violated when the prosecution directly or constructively via investigation detective(s) allowed material ballistics evidence vital to Appellant's defense to be lost or destroyed without attempting to locate, prevent and secure such evidence pursuant to guidelines set by the United States Supreme Court in [*Arizona v. Youngblood*, 488 U.S. 51 (1988)], involving spoliation issues? Was not PCRA counsel ineffective for failing to raise this claim?

5. Was not Appellant's constitutional right violated when the prosecution illegally suppressed material, ballistics evidence, vital to Appellant's defense, via the investigating detective, as alluded to in Appellant's counsel's brief to the Pennsylvania Superior court on direct review? Was not PCRA counsel ineffective for failing to raise this claim?

6. Was not Appellant denied effective assistance of counsel when his pre-trial, trial and appellate counsel failed to investigate a probable *Brady* violation? Is the illegal suppression or constructive suppression of material ballistics evidence missing from discovery as alluded to in counsel's brief to the Pennsylvania Superior Court? Was not PCRA counsel ineffective for failing to raise this claim?

7. Was not Appellant denied effective assistance of counsel when his pre-trial, trial and appellate attorneys failed to investigate a possible spoliation claim which demanded an on-the-record determination of good or bad faith effort, of the prosecution and its agent in locating and preventing the loss or destruction of, or securing the missing ballistics evidence alluded to in appellate counsel's brief to the Pennsylvania Superior Court on direct review? Was not PCRA counsel ineffective for failing to raise this claim?

8. Was Appellant's constitutional right violated when the Philadelphia Police Department failed to conduct a proper crime scene investigation and where there was missing discovery? Was not PCRA counsel ineffective for failing to raise this claim?

9. Was Appellant denied due process of law when the scene investigator falsely testified about the crime scene photo explaining that the crime scene photos he was testifying to were taken roughly 3 years prior to testifying, when in actuality those photos were taken days before his testimony? Was not trial counsel ineffective for failing to highlight this? Was not PCRA counsel ineffective for failing to raise this claim?

10. Whether the trial and Superior Court's ruling on direct appeal regarding Appellant's counsel's waiver of Appellant's sufficiency of the evidence challenge a declaration of Appellant's counsel's ineffectiveness for failing to preserve an appealable claim in accordance with Pa.R.A.P 302(a), and whether a sufficiency challenge based upon such neglect is cognizable under the PCRA, requiring relief? Was not PCRA counsel ineffective for failing to raise this claim?

11. Was not Appellant denied effective assistance of counsel when his attorney failed to investigate Appellant's case or introduce Appellant's high school transcripts from military school which he attended for 4 years being that Commonwealth witness Unique Riggins falsely testified that he knew the shooter from Olney High school, which Appellant never attended? Was PCRA counsel ineffective for failing to raise this claim?

12. Should Appellant's case be remanded to the PCRA court so that Appellant can raise several claims regarding PCRA counsel's ineffectiveness?

Appellant's Brief at 11-13 (edited for grammar and form).

In an appeal from an order denying PCRA relief, we must determine whether the PCRA court committed an error of law and/or whether the record supports its findings of fact. *Commonwealth v. Watkins*, 108 A.3d 692, 701 (Pa. 2014). We review the PCRA court's legal conclusions *de novo*. *Id.* Where the record supports the PCRA court's findings of fact, they are binding on this Court. *Id.* To prevail on a claim of ineffective assistance of counsel,

a PCRA petitioner must plead and prove by a preponderance of the evidence each of the following: (1) that the underlying issue is of arguable merit; (2) that counsel had no strategic basis in support of the disputed action or inaction; and (3) that counsel's error was prejudicial, *i.e.*, that there is a reasonable probability that the outcome of the proceeding would have been different but for counsel's error. **Commonwealth v. Spotz**, 84 A.3d 294, 311-12 (Pa. 2014). "[A] finding that a chosen strategy lacked a reasonable basis is not warranted unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued." **Id.** at 312. For purposes of prejudice, "[A] reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding." **Id.** "A failure to satisfy any prong of the ineffectiveness test requires rejection of the claim of ineffectiveness." **Commonwealth v. Daniels**, 963 A.2d 409, 419 (Pa. 2009).

The PCRA court may dismiss a petition without a hearing when it is satisfied that there is no genuine issue concerning any material fact and that further proceedings would serve no purpose. Pa.R.Crim.P. 907(1). If PCRA counsel seeks to withdraw on the ground that the issues raised by the PCRA petitioner are without merit, she must file a no-merit letter, send the petitioner copies of the application to withdraw and no-merit letter, and advise the petitioner of his right to proceed *pro se* or with a privately retained attorney. **Commonwealth v. Kelsey**, 206 A.3d 1135, 1139 (Pa. Super. 2019). The

- 8 -

no-merit letter must set forth: 1) the nature and extent of counsel's review of the case; 2) each issue that the petitioner wishes to raise on appeal; and 3) counsel's explanation of why each of those issues is meritless. *Id.* Where the no-merit letter does not discuss all of the issues that the convicted defendant has raised in a first PCRA petition and explain why they lack merit, it does not satisfy these mandatory requirements and dismissal of the PCRA petition without requiring counsel to file an amended PCRA petition or a further, adequate no-merit letter is a deprivation of the right to counsel on the PCRA petition. *Id.*

Appellant argues that the PCRA court erred by issuing an order "reappointing" Ms. Amariello to represent him after she filed her initial no-merit letter and the court issued a Rule 907 notice. We disagree.

In this case, the court appointed Ms. Amariello to represent Appellant in his PCRA proceeding. After reviewing Appellant's PCRA petition, Ms. Amariello filed a no-merit letter seeking leave to withdraw on the ground that no issues raised by Appellant, and no other issues in the record, had merit. The court thereupon issued a Rule 907 notice. Appellant responded to the Rule 907 notice by filing a motion to amend his PCRA petition. The court denied Ms. Amariello leave to withdraw and directed her to respond to the issues in the motion to amend. She filed a second no-merit letter concluding that none of the new issues had merit. The court entered an order denying PCRA relief and permitting Ms. Amariello to withdraw.

These facts demonstrate that the court did not "reappoint" Ms. Amariello, for it only appointed her to represent Appellant once. The order that Appellant mischaracterizes as a "reappointment" order merely required Ms. Amariello to complete her duties under her original appointment by reviewing Appellant's motion to amend his PCRA petition. We think this order was entirely proper. It ensured that Appellant received effective representation by directing Ms. Amariello to review the record a second time and determine (again) whether there existed any issue(s) of arguable merit. It also was consistent with the purpose of no-merit letters articulated in **Kelsey**, that is, to guarantee that counsel seeks leave to withdraw only after she reviews **all** issues raised by the PCRA petitioner.[2] **Id.** at 1139.

In his next two arguments, Appellant claims that the Commonwealth withheld evidence of Detective Jenkins' misconduct in violation of **Brady**, and that Appellant's attorneys, including PCRA counsel, were ineffective in failing to raise this violation.[3] We disagree.

_____

[2] Since Appellant does not challenge the contents of the no-merit letters, we will not review their content. **Commonwealth v. Pitts**, 981 A.2d 875, 879 (Pa. 2009), *abrogated on different grounds*, **Commonwealth v. Bradley**, 261 A.3d 381 (Pa. 2021) (appellate court may not *sua sponte* review sufficiency of no-merit letter when defendant has not raised such issue).

[3] In **Bradley**, **supra**, our Supreme Court expanded the opportunity for a PCRA petitioner to raise claims of PCRA counsel's ineffectiveness. Previously, "the sole method by which a petitioner c[ould] challenge the ineffectiveness of PCRA counsel [wa]s by filing of a response to the PCRA court's Rule 907 dismissal notice." **Id.**, 261 A.3d at 386. **Bradley** abandoned that approach
*(Footnote Continued Next Page)*

> To establish a ***Brady*** violation, the defendant must prove:
>
> (1) evidence was suppressed by the state, either willfully or inadvertently; (2) the evidence was favorable to the defendant, either because it was exculpatory or because it could have been used for impeachment; and (3) the evidence was material, in that its omission resulted in prejudice to the defendant. However, the mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense. Rather, evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

***Commonwealth v. Wenzel***, 248 A.3d 540, 550 (Pa. Super. 2021).

The PCRA court held that Appellant failed to establish a ***Brady*** violation relating to evidence of Detective Jenkins, reasoning as follows:

> In support of his ***Brady*** claim regarding Detective Jenkins, [Appellant] relies on a civil case that Recco Ford, the defendant in [an] unrelated homicide, brought against Jenkins in federal court . . . In his [Rule] 907 Response, [Appellant] attached a copy of the complaint in that case, ***Ford v. City of Philadelphia, et al.***, 2012 WL 5228936 (E.D.Pa.). While [Appellant] erroneously refers to the complaint as "a copy of Detective Jenkins' internal affairs file," [Appellant] actually proffered no evidence to show that any internal affairs investigative records exist regarding Detective Jenkins. [Rule] 907 Response at p. 2.
>
> Moreover, in her investigation of [Appellant]'s case, PCRA counsel [Amariello] contacted the Conviction Integrity Unit of the District Attorney's Office and "was advised that there was no 'disclosure

---

by holding that "a PCRA petitioner may, after a PCRA court denies relief, and after obtaining new counsel or acting *pro se*, raise claims of PCRA counsel's ineffectiveness at the first opportunity to do so, even if on appeal." ***Id.*** at 401. Thus, Appellant may claim in this Court that Ms. Amariello was ineffective for failing to claim that the Commonwealth withheld evidence of Detective Jenkins' misconduct, even though he did not raise this claim below.

packet' for [Detective Jenkins]." Supplemental *Finley* Letter at p. 4. PCRA counsel also attempted to contact the Commonwealth witnesses who originally provided statements to Detective Jenkins but was unable to reach those witnesses to obtain any support for [Appellant's] contention that Jenkins committed misconduct in this case. *Id.* Accordingly, PCRA counsel correctly concluded that she was unable to support [Appellant]'s claim that *Brady* material was withheld regarding Detective Jenkins.

Additionally, even if such evidence had been withheld, [Appellant] could not establish prejudice. While Detective Jenkins did interview all four eyewitnesses, he was not the lead detective on the case and did not take any statements alone. Detective Aitken, not Detective Jenkins, took Riggins' statement and signed it as witness. Statement of Unique Riggins 7/17/2013. Detective Jenkins and Detective Grebloski took Adams' statement, with Detective Grebloski signing as witness. Statement of Shawn Adams 7/19/2013. Although the signature page of White's statement is missing, Detective Jenkins and Detective Tolliver took White's statement together. Statement of Kenneth White 7/15/2013. Detective Komorowski and Detective Tolliver took the statement of the final eyewitness, Isaac Guy, who verified his statement during trial. Statement of Isaac Guy 7/17/2013; N.T. 7/13/2016 at 154, 174.

Accordingly, Detective Jenkins was not in a position to coerce the eyewitnesses in this case or fabricate their statements. Therefore, the concealment of any evidence in unrelated cases regarding Officer Jenkins' alleged behavior would not have prejudiced [Appellant].

PCRA Court Opinion, 4/22/21, at 11-12. Having reviewed the record, we conclude that the PCRA court correctly concluded that Appellant's claims concerning Detective Jenkins lack arguable merit, and, in the alternative, fail to satisfy the prejudice prong of the test for ineffectiveness. Accordingly, no relief is due.

Next, Appellant argues that the Commonwealth violated his constitutional rights by concealing ballistics evidence from the crime scene or

allowing this evidence to be destroyed, and that all counsel were ineffective for failing to raise this claim. We disagree. The PCRA court analyzed this issue as follows:

> The evidence that [Appellant] claims prosecutors withheld is "the location of the spent projectiles" from the shooting. Response to *Finley* Letter at p. 4. [Appellant] claims that the fact that no ballistics evidence was presented to the jury "proves that this issue [has] merit and that such evidence was missing from the case." [Rule] 907 Response at p. 2. [Appellant] contends that the placement of ballistics evidence recovered from the site "would be impeaching" if it did not match witness statements. *Id.*; PCRA Petition at p. 18. [Appellant] also contends that "any DNA or fingerprints [that] may have been recoverable from the ballistics would have been significant in determining the identity of the shooter" and "other scientific facts may have been recoverable." PCRA Petition at p. 19.
>
> [Appellant] proffered no evidence to support his contention that prosecutors withheld any ballistics evidence from the defense. His bald contention that such evidence exists and that it would be favorable to the defense is entirely speculative and, therefore, did not entitle [Appellant] to an evidentiary hearing. *See*, *e.g.*, *Commonwealth v. Roney*, 79 A.3d 595, 604-605 (Pa. 2013) (defendant must proffer evidence to support a PCRA claim to be entitled to a hearing; an evidentiary hearing is not a fishing expedition to support a speculative claim).
>
> Moreover, there is nothing in the record suggesting that the police or prosecutors concealed information about the location of any of the fired cartridge casings ("FCC's"). Rather, the trial evidence demonstrated that the location of the FCC's at the time police arrived had little or no probative value. Multiple witnesses testified that there were 10 players on the court where the shooting took place in addition to dozens of other people playing and watching. There was a mass exodus from the park when the shooting started. Many people returned to the court after the shooting and a few attempted to aid the victim. All of this movement occurred before the police arrived at the scene. All of this activity was highly likely to disturb the original locations of the FCC's.

- 13 -

In addition, none of the witnesses pinpointed the location of the shooter in a manner that could have been impeached by the location of the FCC's. Neither Riggins nor Adams mentioned the location of the shooter in either their in-court testimony or their statements to police. White testified at trial that "wherever the shooting was from, it was from a distance. It wasn't on the court." This testimony corresponds with his statement to police that the shooter was "about 12 yards off the basketball court." In his testimony, Casty confirmed his statement to police that he did not see the shooting but saw [Appellant] running from the courts. Since no witness claimed to know where the shooter was standing, the location of the FCC's would be neither exculpatory nor impeaching. As to the possibility that DNA, fingerprints of someone other than [Appellant], or "other scientific facts" may have been recoverable from the FCC's, there is nothing in the record, nor anything proffered by [Appellant], to support this claim.

Finally, the record shows that if anyone sought to destroy ballistics evidence in this case, it was [Appellant]. As stated above, in prison recordings played for the jury, [Appellant] was advised by his brother Isiah that someone named "Pete" had the gun and wanted to "swap it out" instead of destroying it. Isiah assured [Appellant] he would "break that jawn down ... and throw it, throw it, throw it," to which [Appellant] replied, "You got it." The murder weapon was never recovered.

PCRA Court Opinion, 4/22/21, at 13-15 (trial transcript citations omitted). Having reviewed the record, we conclude that the PCRA court correctly concluded that Appellant's claims concerning ballistics evidence lack arguable merit. Accordingly, no relief is due.

Next, Appellant contends that the Philadelphia Police Department failed to conduct a proper crime scene investigation, that there was missing discovery concerning this claim, that a crime scene investigator gave false testimony about the crime scene, and that all counsel were ineffective for failing to raise these claims. We disagree.

- 14 -

The PCRA court reasoned:

As to the crime scene investigation, there is no evidence in the record, nor in anything proffered by [Appellant], that suggest that there was anything omitted from the crime scene investigation that would have somehow assisted the defense. [Appellant]'s claim is entirely based upon speculation and is therefore meritless.

Similarly, there is no reason to believe that any surveillance video would have been helpful to [Appellant]. To the contrary, the record demonstrates that surveillance video, if anything, would have inculpated [Appellant]. During [Appellant]'s prison calls with his brother Isaiah, [Appellant] repeatedly asked his brother to check the park for surveillance cameras as he plotted with his brother to intimidate witnesses and set up a false alibi. Unquestionably, [Appellant] was interested in insuring that there was no surveillance video as he planned his defense.

As to [Appellant]'s claim that discovery was missing, [Appellant] fails to specify what discovery was missing.

PCRA Court Opinion, 4/22/21, at 17 (trial transcript citations omitted).

With regard to the alleged false testimony of the crime scene investigator, the PCRA court wrote:

At trial, Officer Perry testified that on March 18, 2016, between 8:00 p.m. and 8:30 p.m., he took photographs of the crime scene. Those photographs were presented to the jury. Contrary to [Appellant's] claim, Officer Perry never represented that the photos shown at trial were taken "three years prior to testifying." Therefore, [Appellant's] claim is frivolous. Trial counsel cannot be ineffective for failing to highlight testimony that never occurred.

*Id.* at 18.

Having reviewed the record, we conclude that the PCRA court correctly concluded that Appellant's claims concerning crime scene evidence and the investigator's testimony lack arguable merit. Accordingly, no relief is due.

- 15 -

Next, Appellant argues that his attorney on direct appeal was ineffective for failing to preserve a challenge to the sufficiency of the evidence, and that PCRA counsel was ineffective for failing to pursue this claim during PCRA proceedings. We disagree. The PCRA court correctly reasoned that this claim lacked arguable merit because the evidence, viewed in the light most favorable to the Commonwealth, was sufficient to sustain Appellant's convictions on all charges.

The PCRA court reasoned:

1. First Degree Murder

"The evidence is sufficient to establish first-degree murder where the Commonwealth proves that: (1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with the specific intent to kill." *Commonwealth v. Edwards*, 903 A.2d 1139, 1146 (Pa. 2006).

a. Jackson was unlawfully killed.

The Commonwealth presented evidence at trial that Jackson was killed by a gunshot to the left chest. Jackson was also shot in his left buttock. This evidence was sufficient for the jury to find that Jackson was unlawfully killed.

b. [Appellant] was responsible for killing Jackson.

Riggins, Adams, and White, all of whom knew [Appellant] from the neighborhood, testified that the altercation between [Appellant] and Jackson started when they fouled one another while playing basketball. Each of these witnesses gave a statement to police that he witnessed [Appellant] shoot Jackson. Guy, who also knew [Appellant] from the neighborhood, testified that he saw [Appellant] running from the shooting carrying a gun. Riggins and Guy saw [Appellant] later that night walking down Rising Sun Avenue. [Appellant] told Riggins and Guy, "I'm not playing with this nigger. If he lives, I'm going to shoot him again."

- 16 -

The jury also heard testimony that police encountered [Appellant] on the street on July 21, 2013 and asked him to identify himself. [Appellant] gave the name of one of his brothers, and multiple birthdates. Only after being shown a photograph the police had retrieved of the brother whose name [Appellant] was using did [Appellant] give his real name and birthdate. Upon his arrest, [Appellant] spontaneously stated that he "wasn't on the basketball courts that night."

The jury also heard a series of highly incriminating phone calls [Appellant] made while in prison awaiting trial. In one conversation, [Appellant] told his mother that he "really should've ran." He repeatedly asked whether there were video cameras covering the playground, making sure that his brother, Isaiah, had "checked every aspect of that park." In another conversation, [Appellant] and Isaiah urgently discussed the problem that someone named "Pete" had the gun and wanted to "swap it out" instead of destroying it. Isaiah assured [Appellant] that he would "break that jawn down ... and throw it, throw it, throw it," to which [Appellant] replied, "You got it?" In another conversation, after hearing that the defense investigator confirmed that there were no cameras covering the crime scene, [Appellant] told Isaiah, "I was at the crib though wink wink. Know what I'm saying I was at the crib." Isaiah and [Appellant] also discussed the problem of "the motherfuckers that saying [[Appellant]] did it." Isaiah assured [Appellant] that they would find out who those people were before court.

All of this evidence was sufficient for the jury to find that [Appellant] killed Jackson.

c. [Appellant] acted with specific intent to kill.

"The specific intent to kill may be inferred where ... the accused uses a deadly weapon on a vital part of the victim's body." ***Commonwealth v. Cash***, 137 A.3d 1262, 1269 (Pa. 2016). The medical examiner testified that Jackson was shot once in his chest and once in his buttock. Therefore, the Commonwealth showed that [Appellant] used a deadly weapon on a vital part of Jackson's body, his chest. This evidence was sufficient to prove that [Appellant] acted with the intent to kill required to support a conviction for first-degree murder. ***See Cash***, 137 A.3d at 1269; ***Commonwealth v. Briggs***, 12 A.3d 291, 306 (Pa. 2011); ***Commonwealth v. Sanchez***, 36 A.3d 24, 37 (Pa. 2011).

Accordingly, the record contained sufficient evidence to allow a reasonable factfinder to conclude, beyond a reasonable doubt, that [Appellant] was guilty of first-degree murder.

2. Carrying a Firearm Without a License

A person violates section 6106 of the Uniform Firearms Act if he "carries a firearm in any vehicle or ... carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license." 18 Pa.C.S.[A.] § 6106(a)(1). "Firearm" is defined by section 6102 to include "[a]ny pistol or revolver with a barrel length less than 15 inches." 18 Pa.C.S[A.] § 6102. In order to fall under the purview of section 6106, the object must also either be operable or the [Appellant] must have under his control the means to make the object operable. *See Commonwealth v. Gainer*, 7 A.3d 291, 297 (Pa. Super. 2010), *app. denied*, 23 A.3d 1055 (Pa. 2011).

The evidence as described above established that [Appellant] shot Jackson multiple times using a .40 caliber handgun. The Commonwealth and [Appellant] stipulated that [Appellant] did not have a license to carry a firearm at the time of the shooting.

In addition, there was testimony that [Appellant] concealed the gun in a bookbag that he carried with him both to and from the basketball court that day. Accordingly, the record contained sufficient evidence to allow a reasonable factfinder to conclude, beyond a reasonable doubt, that [Appellant] was guilty of carrying a firearm without a license.

3. Carrying a Firearm on a Public Street or Public Properly in Philadelphia

A person violates section 6108 of the Uniform Firearms Act if he "carr[ies] a firearm, rifle or shotgun at any time upon the public streets or upon any public property in [Philadelphia]." 18 Pa.C.S.[A.] § 6108. The evidence described above established that [Appellant] was in possession of a handgun while on a public basketball court in Philadelphia. That was sufficient to prove that [Appellant] was guilty of carrying a firearm on public streets or public property in Philadelphia.

4. Possessing an Instrument of Crime ("PIC")

To sustain a conviction for PIC, the Commonwealth must establish that [Appellant] "possesse[d] any instrument of crime with intent to employ it criminally." 18 Pa.C.S.[A.] § 907(a). An "instrument of crime" is defined as "(1) [a]nything specially made or specially adapted for criminal use .... [or) (2) [a]nything used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have." 18 Pa.C.S.[A.] § 907(d).

The evidence as described above established that [Appellant] intentionally shot Jackson multiple times with a handgun; intending to kill him. Therefore, the Commonwealth proved that [Appellant] possessed the gun for a criminal purpose, used it to commit a crime, and possessed it under circumstances not appropriate for its lawful use. Accordingly, the record contained sufficient evidence to allow a reasonable factfinder to conclude, beyond a reasonable doubt, that [Appellant] was guilty of PIC.

PCRA Court Opinion, 4/22/21, at 19-23 (trial transcript citations omitted).

Having reviewed the record, we conclude that the PCRA court correctly concluded that Appellant's claims concerning the sufficiency of the evidence lack arguable merit. Accordingly, no relief is due.

Next, Appellant argues that trial counsel was ineffective when he failed to introduce Appellant's high school transcripts from military school to impeach Commonwealth witness Riggins' testimony that Riggins knew defendant from Olney High School. Appellant also argues that PCRA counsel was ineffective for failing to pursue this claim during PCRA proceedings. We disagree.

The PCRA court reasoned:

[Appellant] argues that Riggins' statement to police that he recognized [Appellant] from a high school which [Appellant] did not attend "should of [sic] raised red flags as to the truthfulness of what he claimed, that he witnessed the shooting." Motion to Amend PCRA at ¶ 4. Riggins testified at trial that he knew [Appellant] in passing but they were not friends. He testified that he knew [Appellant]'s brother because they attended Olney High School together. Riggins then testified that, although his statement to police said that he and [Appellant] attended Olney High School together, that was likely a typo because he went to school with [Appellant]'s brother, not [Appellant]. On cross-examination, defense counsel and Riggins had the following exchange:

[**Defense Counsel**]: Now, going to the following page, seven lines down, "I know Josh from high school." Is that true?

[**Riggins**]: No. I know his brother.

[**Defense Counsel**]: You know his brother?

[**Biggins**]: Yes, sir.

[**Defense Counsel**]: So you didn't say those words?

[**Riggins**]: No. I doubt if I said that.

[**Defense Counsel**]: The police wrote down something different, correct?

[**Riggins**]: Exactly.

[**Defense Counsel**]: At the bottom of the page, how long have you known Josh? "ANSWER: For about six years. We went to Olney High School." That's false, right?

[**Riggins**]: That's false. He probably was talking about Zay, his brother.

[**Defense Counsel**]: So it seems like the police are confusing Zay with Josh?

[**Riggins**]: Yes, sir.

Accordingly, the jury was aware that [Appellant] did not attend Olney High School, and that the assertion to the contrary in Riggins' statement to police was in error. [Appellant] testified during both direct and cross-examination that he attended Philadelphia Military Academy at Elverson and not Olney High School. In his closing argument, trial counsel reiterated that [Appellant] never attended Olney High School. The Commonwealth never claimed that [Appellant] attended Olney High School. Therefore, it would have been cumulative and completely unhelpful for trial counsel to "investigate ... and introduce" [Appellant]'s high school transcripts. [Appellant] was not prejudiced by counsel's failure to introduce this cumulative evidence.

PCRA Court Opinion, 4/22/21, at 28-29. Having reviewed the record, we conclude that the PCRA court correctly concluded that Appellant's claims concerning trial counsel's failure to introduce the high school transcript did not prejudice Appellant. Accordingly, no relief is due.

Finally, Appellant requests that this case be remanded to the PCRA court in order for him to raise additional claims of ineffective assistance against PCRA counsel. We disagree. While Appellant has the right to contend in this appeal that PCRA counsel was ineffective, he must also comply with other well-settled standards of appellate practice. One such standard is the duty to develop the arguments in his brief beyond mere cursory statements. *Interest of D.C.*, 263 A.3d 326, 338 (Pa. Super. 2021) (appellant's claim failed because "his three-sentence argument is woefully underdeveloped. It is not the role of this Court to develop an appellant's argument where the brief provides mere cursory legal discussion"). As in *D.C.*, Appellant's request for a remand suffers from lack of specificity, because he fails to identify the claims

that he would raise against PCRA counsel. In short, this issue is waived. ***Commonwealth v. Roche***, 153 A.3d 1063, 1072 (Pa. Super. 2017) (failure to properly develop claim in appellate brief renders issue waived).

For the foregoing reasons, we affirm the PCRA court's order dismissing Appellant's petition.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/14/2022